2254    1983

FILING FEE PAID

Yes ___ No ✓

IFP MOTION FILED

Yes ✓ No ___

COPIES SENT TO

Court ✓ ProSe ___

**FILED**

NOV 1 9 2007

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY RYI    DEPUTY

NAME **IVAN TOLAND**

PRISON NUMBER **VO4292**

CURRENT ADDRESS OR PLACE OF CONFINEMENT **CORCORAN/SATF**
**A1-119up   PO. Box. 5242**

CITY, STATE, ZIP CODE **CORCORAN, CA.    93212**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

**IVAN TOLAND**                    ,
(FULL NAME OF PETITIONER)

                    **PETITIONER**

            v.

                              ,

(NAME OF WARDEN, SUPERINTENDENT, JAILOR, OR AUTHORIZED
PERSON HAVING CUSTODY OF PETITIONER [E.G., DIRECTOR OF THE
CALIFORNIA DEPARTMENT OF CORRECTIONS])

            **RESPONDENT**

        and
**THE PEOPLE**
                              ,
The Attorney General of the State of
California, Additional Respondent.

Civil No **'07 CV 2210    JAH POR**

(TO BE FILLED IN BY CLERK OF U.S. DISTRICT COURT)

**PETITION FOR WRIT OF HABEAS CORPUS**

UNDER 28 U.S.C. § 2254
BY A PERSON IN STATE CUSTODY

1. Name and location of the court that entered the judgment of conviction under attack:
   **L.A. COUNTY**

2. Date of judgment of conviction: **8/19/03**

3. Trial court case number of the judgment of conviction being challenged: **B169314**

4. Length of sentence: **13 years AT 85%**

CIV 68 (Rev. Jan. 2006)                                        cv

5. Sentence start date and projected release date: 8/09/03 - 4/27/03

6. Offense(s) for which you were convicted or pleaded guilty (all counts): Assault w/Intent

~ Also ROBBERY MAY 24,1994, CASE NO. SA016417 (PEN. Code, § 667 subd. (B)(1). Five year Prison Enhancement.

to commit Rape dropped to simple Kidnapping (PEN. Code, § 207, subd. (a) -(Count 2), assault with intent to commit a sexual offense (Pen. Code, § 220(count3) three counts of misdemeanor indecent exposure (Pen. Code, § 314) Counts 4, 5, 6.

7. What was your plea? (CHECK ONE)

   (a) Not guilty ☑
   (b) Guilty ☐
   (c) Nolo contendere ☐

8. If you pleaded not guilty, what kind of trial did you have? (CHECK ONE)

   (a) Jury ☐
   (b) Judge only ☑

9. Did you testify at the trial?
   ☑ Yes ☐ No

**DIRECT APPEAL**

10. Did you appeal from the judgment of conviction in the **California Court of Appeal**?
   ☑ Yes ☐ No

11. If you appealed in the **California Court of Appeal**, answer the following:
   (a) Result: DENIED
   (b) Date of result (if known): DEC 07, 2004
   (c) Case number and citation (if known): B169314
   (d) Names of Judges participating in case (if known):

   (e) Grounds raised on direct appeal: THE EVIDENCE IS CONSTITUTIONALLY INSUFFICIENT TO SUSTAIN THE VERDICTS. THE TRIAL COURT ABUSED ITS DISCRETION BY NOT DISMISSING THE STRIKE. THE 13-YEAR SENTENCE FOR HIS NONVIOLENT OFFENCE CONSTITUTES CRUEL AND UNUSUAL PUNISHMENT.

12. If you sought further direct review of the decision on appeal by the **California Supreme Court** (e.g., a Petition for Review), please answer the following:
   (a) Result: DENIED
   (b) Date of result (if known): 2/23/2005
   (c) Case number and citation (if known): B169314

   (d) Grounds raised: THE EVIDENCE IS CONSTITUTIONALLY INSUFFICIENT TO SUSTAIN THE VERDICTS. THE TRIAL COURT ABUSED ITS DISCRETION BY NOT DISMISSING THE STRIKE. THE 13-YEAR SENTENCE FOR HIS NONVIOLENT OFFENCE CONSTITUTES CRUEL AND UNUSUAL PUNISHMENT.

CIV 68 (Rev. Jan. 2006)

13. If you filed a petition for certiorari in the **United States Supreme Court**, please answer the following with respect to that petition:
    (a)  Result:

    (b)  Date of result (if known):

    (c)  Case number and citation (if known):

    (d)  Grounds raised:

## COLLATERAL REVIEW IN STATE COURT

14. Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications, or motions (e.g., a Petition for Writ of Habeas Corpus) with respect to this judgment in the **California Superior Court**?
    ☐ Yes ☒ No

15. If your answer to #14 was "Yes," give the following information:

    (a)  **California Superior Court** Case Number (if known):

    (b)  Nature of proceeding:

    (c)  Grounds raised:

    (d)  Did you receive an evidentiary hearing on your petition, application or motion?
        ☐ Yes ☒ No

    (e)  Result:

    (f)  Date of result (if known):

16. Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications, or motions (e.g., a Petition for Writ of Habeas Corpus) with respect to this judgment in the **California Court of Appeal**?
    ☐ Yes ☒ No

17. If your answer to #16 was "Yes," give the following information:

    (a) **California Court of Appeal** Case Number (if known):

    (b) Nature of proceeding:

    (c) Names of Judges participating in case (if known)

    (d) Grounds raised:

    (e) Did you receive an evidentiary hearing on your petition, application or motion?
       ☐ Yes ☒ No

    (f) Result:

    (g) Date of result (if known):

18. Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications, or motions (e.g., a Petition for Writ of Habeas Corpus) with respect to this judgment in the **California Supreme Court**?
☐ Yes ☒ No

19. If your answer to #18 was "Yes," give the following information:

    (a) **California Supreme Court** Case Number (if known):

    (b) Nature of proceeding:

    (c) Grounds raised:

    (d) Did you receive an evidentiary hearing on your petition, application or motion?
       ☐ Yes ☒ No

    (e) Result:

    (f) Date of result (if known):

CIV 68 (Rev. Jan. 2006)　　　　-4-　　　　cv

20. If you did **not** file a petition, application or motion (e.g., a Petition for Review or a Petition for Writ of Habeas Corpus) with the <u>**California Supreme Court**</u>, containing the grounds raised in this federal Petition, explain briefly why you did not:

## COLLATERAL REVIEW IN FEDERAL COURT

21. Is this your **first** federal petition for writ of habeas corpus challenging this conviction?
    ☒ Yes ☐ No         (IF "YES" SKIP TO #22)
    (a) If no, in what federal court was the prior action filed?
      (i) What was the prior case number?
      (ii) Was the prior action (CHECK ONE):
            Denied on the merits?            ☐
            Dismissed for procedural reasons? ☐
      (iii) Date of decision:
    (b) Were any of the issues in this current petition also raised in the prior federal petition?
        ☐ Yes ☐ No
    (c) If the prior case was denied on the merits, has the Ninth Circuit Court of Appeals given you permission to file this second or successive petition?
        ☐ Yes ☐ No

___

<u>**CAUTION:**</u>
- <u>**Exhaustion of State Court Remedies:**</u> In order to proceed in federal court you must ordinarily first exhaust your state court remedies as to each ground on which you request action by the federal court. This means that even if you have exhausted some grounds by raising them before the California Supreme Court, you must first present **all** other grounds to the California Supreme Court before raising them in your federal Petition.
- <u>**Single Petition:**</u> If you fail to set forth all grounds in this Petition challenging a specific judgment, you may be barred from presenting additional grounds challenging the same judgment at a later date.
- <u>**Factual Specificity:**</u> You must state facts, not conclusions, in support of your grounds. For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do. A rule of thumb to follow is — state who did exactly what to violate your federal constitutional rights at what time or place.

___

## GROUNDS FOR RELIEF

22. State *concisely* every ground on which you claim that you are being held in violation of the constitution, law or treaties of the United States. Summarize *briefly* the facts supporting each ground. (e.g. what happened during the state proceedings that you contend resulted in a violation of the constitution, law or treaties of the United States.) If necessary, you may attach pages stating additional grounds and/or facts supporting each ground.

(a) **GROUND ONE**: THE EVIDENCE IS INSUFFICIENT TO SUSTAIN THE VERDICTS.

Supporting FACTS: THE Identifaction evidence WAS WEAK, inconsistent, suggestive, and tainted. Dorly Mencos identified me, but she did not see my entire face, according to her own testimony. The person was wearing a black beanie. On all three or so occasions the man was wearing a beanie which was pulled over his eyes. Dorly said "there were eye-holes in the beanie", she only thought there were holes. Dorly testified "that it seemed like they had holes on them because when I turned around, I could see like something there. I didn't quite see exactly".
     She thought there must have been holes in order for the man to see, since the beanie was down past his nose. During there search of appellants sister's house. No green beanies or any beanies with eyes holes cut out were recovered. Dorly also had viewed six men in a live line up and she picked out someone other than appellant. Whereas she testified on direct exam that surely it was the appellant she saw. Detective Blizzard who conducted the live line up at the county jail, used six men, all of whom were wearing a red beanie and had a coatee (and one man other than appellant also had connecting side burns). According to Detective Blizzard. Neither Dorly nor her sister Jennifer Mencos identified appellant from the live line up.

**Did you raise GROUND ONE in the California Supreme Court?**

☑ Yes ☐ No.

If yes, answer the following:

(1) Nature of proceeding (i.e., petition for review, habeas petition):

(2) Case number or citation: NO# B169314.

(3) Result (attach a copy of the court's opinion or order if available):

CIV 68 (Rev. Jan. 2006)                    -6-                         cv

**(b) GROUND TWO:** THE TRIAL COURT ABUSED IT'S DISCRETION BY NOT DISMISSING THE STRIKE.

**Supporting FACTS:** The court's failure to consider the harsh punishment already mandated by the five-year mandatory enhancement (Pen. Code. § subd.(a)(1). the the strike (a failed attempt through a handwritten note to obtain money from a bank teller) was unsophisticated and non NONVIOLENT, that the appellant pled nolo contendere and received 3 years probation (with 270 days in county jail) for that offense, and the additional miggating circumstances that he had successfully completed his probation, plus the fact no actual offense was committed. The victim was never examined for injury or injuries. Demonstrates the court's failure to exercise it's discretion to migatigating factors not specifically enumerated. The only aggravating factor enumerated by the court was it's observation that this was a "sad" and seemingly terrifying incident for the victim. However, as defense counsel argued, the fear engendered is subsumed in the offense itself. In examining the nature of offender, courts determine whether the punishment is grossily disproportionate to the defendentit's defendent's individual culpability as shown by such as age, prior criminality, personal characteristics, and state of mind. Appellant's prior and current offenses do not warrant 13 years' punishment. That the people realize this that by there pre-trial offer of four years

**Did you raise GROUND TWO in the California Supreme Court?**

☑ Yes ☐ No.

If yes, answer the following:

(1) Nature of proceeding (i.e., petition for review, habeas petition):

(2) Case number or citation: B169314

(3) Result (attach a copy of the court's opinion or order if available):
   Denied

Court of Appeal, Second Appellate District, Division Two - No. B169314
**S130775**

# IN THE SUPREME COURT OF CALIFORNIA

## En Banc

THE PEOPLE, Plaintiff and Respondent,

v.

IVAN M. TOLAND, Defendant and Appellant.

Petition for review DENIED.

SUPREME COURT
**FILED**

FEB 2 3 2005

Frederick K. Ohlrich Clerk

DEPUTY

GEORGE

Chief Justice

23. Do you have any petition or appeal **now pending** in any court, either state or federal, pertaining to the judgment under attack?
☐ Yes  ☒ No

24. If your answer to #23 is "Yes," give the following information:

(a) Name of Court:

(b) Case Number:

(c) Date action filed:

(d) Nature of proceeding:

(e) Name(s) of judges (if known):

(f) Grounds raised:

(g) Did you receive an evidentiary hearing on your petition, application or motion?
☐ Yes  ☒ No

25. Give the name and address, if known, of each attorney who represented you in the following stages of the judgment attacked herein:

(a) At preliminary hearing . . . . . . . . MS. GATES

(b) At arraignment and plea . . . . . . . MS. GATES

(c) At trial . . . . . . . . . . . . . . . . . . . . MS. GATES

(d) At sentencing . . . . . . . . . . . . . . . MS. GATES

(e) On appeal . . . . . . . . . . . . . . . . . . Maxine WEKSLER State Bar No. 124991
P.O. Box 157

(f) In any post-conviction proceeding . Agoura Hills, CA . 91376

(g) On appeal from any adverse ruling in a post-conviction proceeding:

CIV 68 (Rev. Jan. 2006)

-10-

cv

**26.** Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at the same time?
☒ Yes   ☐ No

**27.** Do you have any future sentence to serve after you complete the sentence imposed by the judgment under attack?
☐ Yes   ☒ No

 (a) If so, give name and location of court that imposed sentence to be served in the future:

 (b) Give date and length of the future sentence:

 (c) Have you filed, or do you contemplate filing, any petition attacking the judgment which imposed the sentence to be served in the future?
☐ Yes   ☒ No

**28.** Consent to Magistrate Judge Jurisdiction

  In order to insure the just, speedy and inexpensive determination of Section 2254 habeas cases filed in this district, the parties may waive their right to proceed before a district judge and consent to magistrate judge jurisdiction. Upon consent of all the parties under 28 U.S.C. § 636(c) to such jurisdiction, the magistrate judge will conduct all proceedings including the entry of final judgment. The parties are free to withhold consent without adverse substantive consequences.

  The Court encourages parties to consent to a magistrate judge as it will likely result in an earlier resolution of this matter. If you request that a district judge be designated to decide dispositive matters, a magistrate judge will nevertheless hear and decide all non-dispositive matters and will hear and issue a recommendation to the district judge as to all dispositive matters.

  You may consent to have a magistrate judge conduct any and all further proceedings in this case, including the entry of final judgment, by indicating your consent below.

Choose only one of the following:

☐ Plaintiff consents to magistrate judge jurisdiction as set forth above.          **OR**          ☒ Plaintiff requests that a district judge be designated to decide dispositive matters and trial in this case.

**29.** Date you are mailing (or handing to a correctional officer) this Petition to this court:

Wherefore, Petitioner prays that the Court grant Petitioner relief to which he may be entitled in this proceeding.

_____

SIGNATURE OF ATTORNEY (IF ANY)

I declare under penalty of perjury that the foregoing is true and correct.  Executed on

_____    _____

(DATE)                                      SIGNATURE OF PETITIONER

**(d)    GROUND FOUR:**

**Supporting FACTS:**

**Did you raise GROUND FOUR in the California Supreme Court?**

☐ Yes ☒ No.

If yes, answer the following:

(1)   Nature of proceeding (i.e., petition for review, habeas petition):

(2)   Case number or citation:

(3)   Result (attach a copy of the court's opinion or order if available):

**(c)** GROUND THREE: THE 13-YEAR SENTENCE FOR THIS NONVIOLENT OFFENCE CONSTITUES CRUEL AND UNUSUAL PUNISHMENT

**Supporting FACTS:** Dr. Anderson's opinion was corroborated by character witnesses for the defense. Deputy Sheriff Phil Johnson, who has known appellant since his infancy, opined that he could not see appellant committing these or any violent crimes, because appellant "does not have a violent bone in his body... He's a very humble man, a very simple and He would have to be CRAZY to do what he is charged charged with and He's not CRAZY."

Appellant's brother-in-law, Mark Mercado, agreed, opining that appellant would not commit a kidnapping or a physical assault on a woman or a girl with the intent to commit a sex crime. A crucial factor weighing against appellants guilt is the medical evaluation of DR. RAYMOND ANDERSON, a psychologist specialized in the assessment and treatment and treatment of sex offender patients. Specifically, in His summary of findings DR. RAYMOND ANDERSON, opined: " Basically, [appellant] does not seem to be personally disordered in a way or to a degree that would be consistent with either exhibitionist or rape behavior. When combined with the facts that appellant did not fit a sexual predator profile and the medical report showed the mark on the appellant shoulder was not a puncture wound, the evidence must be constitutionally insufficient to sustain appellant's conviction on all counts. Such a sentence is unconscionable and violates the UNITED STATES and the CALIFORNIA CONTITUTIONS' against cruel or unual punishment.

**Did you raise GROUND THREE in the California Supreme Court?**

☑Yes ☐ No.

    If yes, answer the following:

    (1)   Nature of proceeding (i.e., petition for review, habeas petition):

    (2)   Case number or citation: B169314

    (3)   Result (attach a copy of the court's opinion or order if available):

In Pro Per

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

### COUNTY OF SAN Diego

| | |
|---|---|
| In re<br><br>IVAN TOLAND<br>[Place your name here]<br><br>On Habeas Corpus | No.<br><br>REQUEST FOR APPOINTMENT<br>OF COUNSEL AND DECLARATION<br>OF INDIGENCY |

I, [place name here], declare that I am a petitioner to the above-referenced matter, that I am incarcerated at [place prison here], and that I an indigent and unable to afford counsel. My total assets are $___0___ and my income is $___0___ per month.

I hereby request that counsel be appointed in this matter so that my interests may be protected by the professional assistance required. In addition, when a court issues an order to show cause, counsel must be appointed for an indigent petitioner who requests counsel. California Rules of Court, rule 4.551 (c)(2).

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on [place date here].

[Signature]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT, DIVISION TWO

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA, | ) ) ) | Appeal No. B169314 |
| | ) | (Super Ct. No. LA040104) |
| Plaintiff and Respondent, | ) ) | |
| vs. | ) ) | |
| IVAN M. TOLAND, | ) ) | |
| Defendant and Appellant. | ) ) | |

APPEAL FROM THE JUDGMENT OF

THE SUPERIOR COURT, COUNTY OF LOS ANGELES

THE HONORABLE MICHAEL HOFF, JUDGE PRESIDING

APPELLANT'S OPENING BRIEF

Maxine Weksler
State Bar No. 124991
P.O. Box 157
Agoura Hills, CA 91376
(818) 865-1965
Attorney for Appellant,
Ivan Toland

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES                                                    ii

STATEMENT OF THE CASE                                                   1

STATEMENT OF THE FACTS                                                  2

ARGUMENT                                                                4

I.    THE EVIDENCE IS CONSTITUTIONALLY
      INSUFFICIENT TO SUSTAIN THE VERDICTS.                            17

II.   THE TRIAL COURT ABUSED ITS DISCRETION BY NOT
      DISMISSING THE STRIKE.                                          28

III.  THE 13-YEAR SENTENCE FOR HIS NONVIOLENT OFFENSE
      CONSTITUTES CRUEL AND UNUSUAL PUNISHMENT.                       32

CONCLUSION                                                            29

# TABLE OF AUTHORITIES

Page(s)

Cases

In re Lynch (1972) 8 Cal.3d 410                                    33

Jackson v. Virginia (1979) 443 U.S. 307                           17

People v. Bassett (1968) 69 Cal.2d 122                            17

People v. Bishop (1997) 56 Cal.App.4th 1245                       30

People v. Covino (1980) 100 Cal.App.3d 360                        29

People v. Dillon (1983) 34 Cal.3d 441                             33-35

People v. Garcia (1999) 20 Cal.4th 490                            29

People v. Guardado (1995) 40 Cal.App.4th 757                      17

People v. Rowland (1992) 4 Cal.4th 288                            17

People v. Superior Court (Alvarez) (1997) 14 Cal.4th 968          29

People v. Superior Court (Romero) (1996) 13 Cal.4th 497           28

People v. Tatlis (   ) 230 Cal.App.3d __                          29

Solem v. Helm (1983) 463 U.S. 277                                 33

Constitutions

California Constitution, article I, section 15                    17

California Constitution, article I, section 17                    32

United States Constitution, Eighth Amendment                     32

United States Constitution, 14th Amendment                       17

## STATEMENT OF THE CASE

Appellant was charged in a six count Information with kidnapping to commit rape (Pen. Code,§ 209, subd. (b)(1) (Count 1), simple kidnapping (Pen. Code, § 207, subd. (a) (Count 2), assault with intent to commit a sexual offense (Pen. Code,§ 220 (Count 3), all  felonies, and three counts of misdemeanor indecent exposure (Pen. Code, § 314(1)) (Counts 4, 5, and 6).   He was further charged with one prior serious felony conviction (a robbery, on May 24, 1994, Case No. SA016417), pursuant to the Three Strikes law (Pen. Code, § 667, subds. (b) through (I) and 1170.12, subd. (a) through (d)), and also as a five-year enhancement under Penal Code section 667, subdivision (a)(1). (CT 108-112)   Prior to trial, the prosecutor amended the Information to charge Count 2 as an attempted kidnapping and, in exchange for appellant's waiving his right to a jury trial and agreeing to a court trial, moved to dismiss Count 1.   (RT A-3 to A-4)

The court found appellant guilty of Counts 2, 3, 4, and 5 and not guilty of Count 6. It also found true the prior robbery allegation.  (RT 945)  Appellant's motion to dismiss the strike and request to impose a low term sentence were denied. The court selected the mid-term sentence of 4 years on Count 3, which it doubled as a strike, then enhanced the sentence five years pursuant to section 667, subdivision (a)(1), for a total prison term of 13 years.  The court stayed imposition of sentence on Count 2 pursuant to section 654, and imposed concurrent six month terms each

1

on counts 4 and 5.  (RT 1220)   Appellant was given custodial credit of 574 days,

including 513 days actually served plus 61 for good time/work time, and ordered to

pay fines of $500 as restitution and $500 for parole services (Pen. Code, § 1202.45),

the latter being stayed pending appellant's successful completion of parole.  (CT

168-172; RT 1221)

       Appellant timely filed his notice of appeal from the judgment of

conviction. (CT 173).

## STATEMENT OF THE FACTS

<u>The Prosecution Case</u>

On Tuesday, March 12, 2002, at about 3:30 p.m., 17-year-old Dorly
Mencos , was walking home from high school in Los Angeles County, when she saw
a man showing his erect penis.  He had come out from an alley next to some
apartment buildings, began walking towards her on the same side of the street,  and
caught her attention by making "ch-ch-ch" sounds.   When he exposed himself, she
was about five feet away.   She ran home and told her parents.  Her father told her
not to walk by there anymore.   The next day, at about 3:00 p.m., on the same
stretch of road, the same man again walked towards Dorly with his erect penis
exposed through an opening in his pants.  Again, she ran home.  (RT 3-11)   The
following day, Dorly saw the man again near two little girls, about six and eight
years old.  The older girl was covering the younger girl's face and telling her to
hurry up.   The man's erect penis was exposed; and he was gyrating or thrusting his
pelvis forward, showing his penis to the young girls.   The girls ran; and Dorly tried
to cross the street but there were too many cars.  The man, who was  wearing a red
beanie, jeans, and a two toned sweater – green with a blue horizontal stripe, came
running towards her.  She next felt him pulling her arm and trying to grab her by the
neck.  His penis rubbed against her leg.  He pulled her towards an apartment

3

building, the gate to which was propped open by a rock or stick.  He had pulled her

maybe six feet; and she feared he was going to drag her into an apartment and do

something sexual to her.   She had a pen in her hand and began stabbing him with it,

upwards in his left shoulder area.  He winced and released her.   He ran westbound

and turned down a no-outlet street and parking lot area.  Dorly ran to her house,

then  hid behind some bushes in her front yard because she saw the same man

driving by her house in a red Jeep with no top, which she had seen exit an alley.  He

was driving slowly while looking around.   After the car passed, she entered her

home and called the police.  (RT 12-22, 51-57, 71)

On all three  occasions, the man was wearing a beanie which was

pulled down over his eyes.  The first day Dorly saw him,  he was wearing a black

beanie; the second day he was wearing a green beanie; and the day he grabbed her,

he was wearing a red beanie.  The beanies were pulled down to under his nose, so

all she could see of his face was his mouth and chin area.  She had told the police

that the beanies had holes cut around the eyes; but at trial she did not remember if

there actually were eye-holes.   The man also wore different pants each day. (RT 38-

43, 53-54, 75-76)

Dorly described the man as about 30 years old, between five nine and

five ten inches tall and weighing between 160 and 180 pounds.  He had a mustache

going down from the sides of his nose to his chin.  She did not see the man's entire

4

face because it was mostly covered by the beanie (RT 3-8, 624-626, 633).  She

identified appellant in court as that man, although his facial hair looked nothing like

that of the man she saw.  The man who grabbed her had sideburns, exactly like those

in appellant's booking photograph, which was used in a photo six pack.  (RT 23, 80-

81)  Dorly identified appellant as her assailant from the photo-six pack because of

his goatee, lips and chin.  She also attended a live line-up and selected a man whom

she was sure was her assailant; but it was not appellant. (RT 50)

       Dorly's sister, Jennifer, also saw a man exposing himself.  On March

7, she was walking westbound toward Reseda, when she heard a door opening.  She

turned and saw a man on the stairs wearing a white, long-sleeved thermal shirt and

no pants.  He was holding his erect penis and looking at her.  He had hair "from the

nostril around the mouth to the chin."   Jennifer ran to the bus stop.   She did not

notify the police until her sister reported the similar incidents a week later.  At that

time Jennifer described the man to the police and showed them the building where

she had seen him.  An apartment door was open at the time – the door to unit

number three.  Jennifer conceded that she had previously testified that the unit

number was seven.  She changed her mind when the district attorney showed her a

photograph of apartment number three.  She had not seen that photograph when she

testified earlier.  At that time she could not remember and was nervous.   (RT 84-

90, 604-606)

When Jennifer went with the police to show them where she had seen the man, her sister, Dorly came with. They stayed together in the police car the entire time. Dorly pointed out a building to the police – a different one from the building where Jennifer saw the man on the stairs. Dorly also showed the police a gate, which was near the door Jennifer had pointed out. Jennifer identified appellant in court and from a booking photo as the man in the white thermal shirt. In the photo he had the same facial hair and sideburns of that man; but in court he had less facial hair. Jennifer had also attended the live lineup in which appellant was a participant; neither of the two men she selected as resembling the assailant, however, was appellant. Although appellant's booking photo was in the six-pack she was shown, she did not identify him. (RT 91-102)

Detective Blizzard assembled the photo six-pack, and conceded that appellant was the one with the lightest complexion.[1] (RT 317-321) Dorly selected appellant but Jennifer made no identification. Detective Blizzard also conducted a live lineup at county jail, with six men, including appellant, all wearing a red beanie and a goatee. One man other than appellant also had sideburns connected to the goatee. Neither Dorly nor Jennifer Mencos selected appellant – each selected other men instead.

_____

[1]Detective Blizzard described appellant's nationality as a mixture of white, Hispanic and maybe Asian. (Appellant is half Filipino and half white.) His fingerprint card from his prior conviction indicates his race as Oriental (CT 134).

6

In an interview Detective Blizzard conducted with appellant on March 14, appellant told her that he had been wearing a tan sweater with a blue stripe and a red beanie that day. He admitted having access to a red Jeep, which he said belonged to his brother Danny. Whereas he had initially told Blizzard that he had not left his apartment all afternoon, he changed that to say he had gone outside once to move a vehicle belonging to a family member. He said this after being told his car and clothing had been described by the victims. Detective Blizzard also noticed a small round wound on the back of appellant's left shoulder. Appellant said he did not know how he got it. (RT 313-316)

At about 5:30 or 6:00 p.m. on March 14th; Sergeant Puente went to unit no. 3 at 18425 Saticoy Street, believing the suspect might be living there. Appellant answered the door. Using a ruse to see who lived there, Puente, asked him about a collision in the parking lot. (RT 330-332, 342-343) Believing appellant matched the suspect's description, Sergeant Puente returned to the station, conferred with the investigating officers, and had Dorly Mencos return to the station for a further description. At approximately 8:00 p.m., Sergeant Puente returned to unit 3 and arrested appellant. He was holding a red beanie when he answered the door. Several hours later, the officers returned with a search warrant. The search of a downstairs closet area uncovered two black beanies, one plain and one with a

7

yellow "P" encircled, and a sweater, with a blue stripe across the middle.[2]   A long-sleeved thermal shirt was recovered from a hamper in the master bedroom.   The thermal shirt had a one-inch tear in the front.   No blue jeans with holes in them, green beanies or any beanies with cut-out eye holes were recovered.  (RT 333-347)

Officer Maldonado responded to the Mencos' home concerning a child molestation report.   Dorly described the suspect as a male Hispanic in his early thirties, approximately 160-80 pounds,[3] who was wearing a red knit cap, a green sweater with a blue horizontal line across the chest, and Levi's, which, she believed, had a hole in the crotch area where his penis was exposed.   She said he had a goatee, extending into his sideburns.   She told the officers that the man had grabbed and attempted to drag her towards a gate at the apartment complex and that she escaped by stabbing him in his upper left shoulder area.(RT 354-357)   She showed them the location of the incident and the gate, which was in front of unit numbers 7 and 8. (RT 360, 363-364)

Dorly's sister, Jennifer, was in the police car when Dorly showed the officers the crime scene.   Upon returning to the sisters' home, Jennifer told Officer

---

[2] The sweater was described by the prosecutor as being a tan weater with a blue stripe. It also appeared to have white, and five stripes, with two stripes going through it and a blue-greenish stripe around the neck.  (RT 339-340)

[3] Officer Maldonado estimated appellant's height as 5'8" to 5'9" and his weight at approximately 180 pounds.  He learned from appellant that he was 30 years old.  (RT 635)

8

Maldonado that a week before, a man matching Dorly's description of the suspect, was standing in the same complex wearing a white thermal shirt exposing his penis. Officer Maldonado brought both Dorly and Jennifer back to the complex a second time, and Jennifer pointed out the stairwell where she had seen the suspect. That stairwell led to unit numbers 3 and 4.   After taking the girls home, Maldonado called them back to the station for a more detailed description of the beard.   Both girls described it as "a very unusual goatee type ... with connecting sideburns through the side of his face and coming up to his chin."  (RT 364-366, 627-630)

Officer Maldonado was present during the search and recovery of the clothing  (the thermal shirt, sweater, and beanies), which he booked  as evidence. (RT 367-368). He also examined appellant for injuries and noted a fresh, superficial, "puncture" wound on the back of his left shoulder.  Its location was consistent with Dorly's demonstration indicating she had stabbed the suspect in the left shoulder area.   Appellant was treated for the wound at Van Nuys Dispensary. (RT 641) Dr. Posey examined appellant's wound and found that it had no characteristics of a puncture wound.  (Dr. Posey's report, Defense Exhibit K;  RT 938-939.)

9

## The Defense Case

Anita Orosco Mercado, appellant's younger sister, testified that she was home with appellant in the afternoon of March 14, 2002.  Appellant had been living with Anita for about two and a half months. His responsibilities were to take care of her three children, ages 5, 4 and 2.   That day, she was home from noon until 6:15 p.m., when she left for a dinner date with a friend.  At approximately 3:00 p.m., she began preparing dinner for her family.  She began early because she needed about two hours to get ready for her dinner date.  (RT 657)  While Anita was in the kitchen, appellant was sleeping on the couch in the living room.  She observed appellant him sleeping at between 3:00 and 3:10, at which time she was about to ask him to help her chop onions.  Upon seeing he was asleep, she decided not to wake him.  She was able to see into the living room from the upper level kitchen.  Although appellant was not directly in Anita's line of vision and she did not watch him every minute, she would have heard him if he went outside.   Anita woke appellant woke just after four, so he could eat before the children came downstairs.  (RT 658-661, 676)

Appellant kept his clothes in the bottom closet in the living room.  The only clothes kept in the hamper in her bathroom were Anita's, her husband Mark's, and her children's.  Appellant had only a few articles of clothing, which he kept in a

10

bag and laundered himself. Her husband had two thermal shirts, a white and a blue one; but she had never seen a slit in his white thermal shirt. (RT 661-664) Appellant's car was a red Jeep with an open top. (RT 678)

Anita described other male tenants resembling appellant in her building. In unit number seven, for example, there lived a Mexican man, his wife, his brother, and a kid. The husband had black hair and a mustache; he was in his early 30's and about five nine, with some weight on him. His brother was shorter, about five six, and chubbier, with dark features and facial hair. Anita had also seen men going in and out of the clinic, which she described as a busy place. (RT 682-683)

Appellant testified that in March of 2002, he was living at his sister Anita's house with her husband, Mark Mercado, and their three children. He was unemployed and agreed to babysit while Anita and Mark were working. On March 14, he was home with Anita all afternoon. He took a nap on the living room couch between 1:00 and 2:00 p.m. At one point, his sister asked him to cut onions. He did not cut them, but went back to sleep. When he woke up, he had dinner. Afterwards, he watched television with the kids. Anita left that evening around 6:00 and her husband, Mark, came home around 7:00 or 8:00. (RT 694-696, 703)

Appellant denied having had contact with any girls outside. He never propped open a gate in front of the apartment buildings; he never grabbed a girl; and

11

he never exposed his penis to anyone.  He sometimes went outside on the sidewalk to smoke cigarettes; but he  never went outside without wearing his pants.  (RT 697-698, 702-703)

As to the mark on his back, appellant testified that he believed it was a pimple. He had not mentioned the pimple during his interview at the station because he did not think it was anything.  (RT 705)  As to why he had not provided the police with an alibi, he was told his crime was kidnapping, meaning to him the abducting of a child, which he had not done.  So he did not believe he had anything to worry about or explain. (RT 718)  Appellant denied  driving a jeep that day.  As to his telling Detective Blizzard that he had left the house only to move a vehicle, he explained that he had tried to move a vehicle, but did not succeed.  He admitted that he had a 1993 Jeep Wrangler with a convertible top but stated it was registered in his brother's name.  (RT 701, 720-721)

Over objection, the prosecutor asked appellant a series of questions regarding answers he gave to a psychological test, which also asked for the frequency of his feelings, ranging from never to always.   Following are the questions to which he answered "yes' or "true" and his explanations:

1.    At times I have a strong urge to do something harmful or shocking.   Appellant meant to himself; but he did not have urges to do something shocking to himself.

12

2.    I have had very peculiar and strange experiences.   Appellant meant out of the ordinary experiences, like this case.  (RT 717)

3.    I've often been punished without cause.

4.    I am worried about sex.   Appellant meant he was worried about relationships, e.g., devoting his time to someone and having her leave.

5.    I wish I were not bothered by thoughts about sex.  Appellant meant he was sometimes concerned about not having a sexual partner.  He has had partners in the past and would like to have one again.  (RT 717)

6.    Masturbation can be an exciting experience – slightly agree;

7.    Thoughts about sex disturb me more than they should – sometimes.  Appellant explained that he was disturbed by such everyday choices as to whether and when, if  he is in a relationship, he should have sex.   (RT 713)

8.    I have felt guilty about my sex experiences – sometimes.  To appellant, this meant his wasting time with somebody or spending time with somebody when he thought something was there and it went wrong.

9.    I would like to see a psychiatrist – sometimes.   Appellant gave this answer not because of any sexual problem he had but because everyday life can be stressful.  (RT 713)

10.    Sex contacts have been a problem for me – often.   Appellant explained that he was shy when it comes to relationships and the sex part could be a

13

problem.  He could not always just pick up the phone and get involved.  (RT 713)

11.    My conscience bothers me too much – sometimes.  Appellant explained that this involved everyday life situations – more in terms of hurting someone in a  relationship.

12.    Perverted thoughts bother me – always.  Appellant meant that he was bothered by people, not himself, who were perverted – i.e., others' having thoughts of having sex with kids, playing with themselves while walking down the street.  He did not himself have perverted thoughts.  (RT 714)

13:    At times sex thoughts almost drive me crazy – always. Appellant meant the whole idea of whether and when he should have sex.

14.  The only way I could do harm to a child when having sex with her or him would be to use physical force to get her or him to have sex with me.  – strongly agree.   Appellant meant that he agreed it was wrong to force oneself on children. (RT 712)

As to appellant's response that he has made lots of bad mistakes, this related to some past situations, specifically, the prior bank robbery he committed. (RT 716)

Appellant admitted that on May 24, 1994, he was convicted of robbery.  He served no prison time for that crime.   (RT 722-724)

14

Defense investigator Lawrence Sanchez had appellant try on the thermal shirt, which had a cut in the lower front portion. Appellant attempted to put his penis through the hole in the shirt, but was able to do only by bending at the waist at a 45 degree angle. When he stood up straight, "his penis popped back out of the hole." That happened because the hole was too high – it was midway between his penis and navel. Sanchez believed his penis would have popped out whether it was erect or flaccid. (RT 650-653)

Two character witnesses testified on behalf of appellant. Phil Johnson, a Deputy Sheriff with Riverside County and family friend since appellant was born, believed he knew appellant's character well enough to render his opinion that appellant would not have committed the instant crimes. He opined that appellant "does not have a violent bone in his body," that he was a very humble and simple man, and that one "would have to be crazy to do what he is charged with and he's not crazy." Deputy Johnson's knowledge that appellant was convicted of robbing a bank in which he threatened a bank teller by claiming he had a gun, and that the reason he did so was because he owed a large ($1700) phone-sex bill, would not change his opinion. It was his understanding that appellant did not actually have a gun. (RT 908-912) Appellant's brother-in-law, Mark Mercado, who has known appellant for about 10 years, also opined that appellant would not commit a kidnapping or a physical assault on a woman or girl with the intent to commit a sex

15

crime. His opinion was not affected by appellant's prior robbery of a bank, whether or not he told the teller he had a gun or because it was to pay off a large phone-sex bill. (RT 922-923) He further opined that the psychological questions appellant answered could not be connected with the crimes charged against since he believed all young men had occasional problems or bad experiences with sex. (RT 933)

The parties stipulated to the admission in evidence of the report of psychiatrist, Dr. Raymond Anderson, finding it was "out of character" for appellant to have committed the crimes charged (Defense Exhibit J), in lieu of his testimony. (RT 723)    The parties also stipulated to admitting in evidence the handwritten interview statement by a defense investigator regarding a new witness, appellant's neighbor, who stated that a week prior to appellant's arrest, she had seen a strange man loitering in the vicinity of the clinic and that the police had been there asking questions about him (Defense Exhibit L) (RT 904-905).

# ARGUMENT

## I.

## THE EVIDENCE IS INSUFFICIENT TO SUSTAIN THE VERDICT

In determining whether the verdict is constitutionally sufficient, this court must determine whether, viewing the evidence in the light most favorable to the verdict, and presuming in support of the judgment the existence of every fact the trier reasonably could deduce from the evidence, there is substantial evidence of appellant's guilt -- i.e., evidence that is credible and of solid value -- from which a rational trier of fact could have found the defendant guilty beyond a reasonable ✗ doubt. (*People v. Guardado* (1995) 40 Cal.App.4th 757, 761. ˙ Not only must this court resolve the issue in the light of the whole record, but it "must judge whether the evidence of each of the essential elements ... is substantial." (*People v. Bassett* (1968) 69 Cal.2d 122, 138.)

A state court conviction that is not supported by sufficient evidence violates the due process clause of the 14th Amendment of the United States Constitution and is invalid for that reason. (*Jackson v. Virginia* (1979) 443 U.S. 307, 313-314.) A California conviction without adequate support separately and independently offends, and falls under, the due process clause of article I, section 15, of the California Constitution. (*People v. Rowland* (1992) 4 Cal.4th 288, 269.)

17

Because the court's verdicts finding appellant guilty of attempted kidnapping, assault with intent to commit a sexual offense, and indecent exposure are not supported by sufficient evidence, they are invalid and must be set aside.

The identification evidence was weak, inconsistent, suggestive, and tainted. Dorly Mencos identified appellant in court as the man who had exposed himself and grabbed her. She recognized him only by a beanie and his facial hair, which she described as a mustache going down from the sides of his nose to his chin — but she did not see the man's entire face because he was wearing a black beanie. (RT 3-8) On all three occasions, the man was wearing a beanie which was pulled down over his eyes. Although she had testified previously that the beanie had holes cut around the eyes, she did not remember whether it actually had holes. When Dorly said there were eye-holes in the beanie, she only thought there were holes. She testified, "[I]t seemed like they had holes on them because when I turned around, I could just see like something there. I didn't quite see exactly." She thought there must have been holes in order for the man to see, since the beanie was down past his nose. (RT 75-76)   Because the beanies were pulled down to under the man's nose, she could only see his skin below his nose and his neck.   (RT 38-43)  During their search of appellant's sister's house, no green beanies or any beanies with eye holes cut out were recovered . (RT 347)

18

Dorly described the pants the man was wearing on the third day (dark blue baggy pants) as having had a big hole in them.  (RT 40, 43)  [9] At trial she testified that she had told the police that the man had worn a jacket one day, a hooded sweatshirt another day, and a sweater the third day.  (RT 53-54)  [10] At the preliminary hearing, however, Dorly testified that the man was wearing a shirt, not a sweater.  (RT 63)  [11] On redirect exam at trial, she insisted she had said it was a dark green sweater.  (RT 71)  [12] The police recovered from appellant's home a *tan* sweater with a blue stripe, but no hooded sweatshirt and no jacket and no pants with holes in the crotch area.  Also, [13] Dorly had told the police that this happened not on three consecutive days, but two times the week of March 14th and once a month before.  (RT 40)

[14] Dorly selected appellant from a photo-six pack – because of his goatee, lips and chin.  [15] Detective Blizzard prepared the six-pack.  She described appellant's nationality as a mixture of white, Hispanic and maybe Asian.  [He is white and Filipino].  She conceded that among the six individuals appearing in the photo six-pack, appellant had the lightest complexion.  (RT 317-321)  Dory testified that appellant's facial hair (as it appeared in his booking photograph) was exactly the same as that of the man she saw on the street.  But she had described the man having a mustache, and conceded that appellant had more hair on the lower part of his chin than on the upper part.  [16] Dorly also had viewed six men in a live lineup

19

and picked out someone other than appellant. Whereas she testified on direct exam

that she was sure the person she selected was her assailant, on cross-examination,

she testified that she was not sure the person she selected was appellant.   (RT 27-30,

44, 50, 78-81)   Detective Blizzard, who conducted the live lineup at county jail,

used six men, all of whom were wearing a red beanie and had a goatee (and one man

other than appellant also had connecting sideburns).  According to Blizzard, neither

Dorly nor her sister Jennifer Mencos identified appellant from the lineup.   Dorly

identified another man (in position no. 1) and Jennifer selected two other men (in

position nos. 2 and 6).  (RT 309-311, 328)  Although appellant's facial hair at trial

looked nothing like that of the man Dorly had seen on the street, Dorly identified

him as that man at trial.

      Dorly's sister, Jennifer, testified that the week before, she, also, saw a

man, whom she identified at trial as appellant, exposing himself.   The man was on

the stairs wearing a white, long-sleeved thermal shirt and no pants or underpants.

He was holding his erect penis and looking at her.   The man had hair "from the

nostril around the mouth to the chin."   Jennifer ran to the bus stop.   She did not

notify the police until her sister reported the similar incidents.   Whereas Jennifer

had initially reported that the man had been standing outside near the open door of

apartment no. 7, at trial she claimed it was apartment number 3.   She changed her

mind because she "couldn't remember about it.  I was nervous about it."   She

believed the apartment was number 3 because that was the apartment depicted in the photograph she was shown by the district attorney. She had not been shown that photograph at the preliminary hearing. (RT 88-90)    Although appellant's photograph was included in the photo six-pack she was shown and he was one of the six men in the live line-up, Jennifer had not selected appellant from either grouping. (RT 91, 102)

Also, the identification was tainted by the sisters' not having been separated while the incidents and suspect was described. Both sisters were together in the police car when each pointed out where she had seen the man exposing himself..   They stayed together in the police car the entire time. According to Officer Maldonado, who had brought to girls to the location, Jennifer had heard Dorly's description of the suspect and told Maldonado that it matched the man she saw the week before.   Jennifer had not mentioned having herself been a victim prior to that time. (RT 379-380)    It was after Dorly had pointed out the location where she had seen the man, while her Jennifer was with her in the police car, and they returned to the sisters' home that Jennifer first told Maldonado that she, too, had seen a man exposing himself in the same vicinity. Maldonado then took both girls back a second time. He wanted Jennifer to point out the precise "second building" and stairwell she described. He then took them back home, but called them back to the station for a more detailed description of the beard. *Both* victims described the

21

beard as "a very unusual goatee type ... with connecting sideburns through the side of his face and coming up to his chin." The sisters were in the same room when Maldonado obtained this description. (RT 627-630)

Although Dorly had pointed out a building different from the one where Jennifer saw the man on the stairs, the gate Dorly showed the police was "kind of near" to the door Jennifer had pointed out. Jennifer identified appellant from his booking photograph. He had the same facial hair and sideburns of the man in the thermal shirt. (RT 99-102)

While a white thermal shirt had been recovered from appellant's sister's home, the evidence was weak that it was the one Jennifer had seen the man wearing. Jennifer testified that the man's penis was visible under the shirt, that it was *not* coming out of a hole, and that there was no hole in the shirt. (RT 604-606) The thermal shirt recovered, however, had a one inch tear or cut in the crotch area. Also, the thermal shirt was recovered not from appellant's closet, but from a hamper in the master bedroom used by appellant's sister Anita and her husband, Mark. Mark testified that the white thermal shirt belonged to him, that he had worn it earlier that week, and there was no hole in the crotch area of the thermal shirt. (RT 929) According to Anita, appellant kept his clothes in the lower level closet in the living room and did his own laundry. The only clothes kept in the hamper in her bathroom were hers, her husband Mark's, and her children's. Appellant had only a

22

few articles of clothing, which he would put in his own bag or wash right away. Her husband had two thermal shirts, a white and a blue one. She had never seen a slit in his white thermal shirt. (RT 661-664)

Moreover, the experiment conducted by defense investigator Sanchez revealed the near impossibility of appellant being able to manipulate his flaccid or erect penis through the hole in the thermal shirt. Mr. Sanchez testified that he had appellant take down his pants, put the thermal shirt on, and attempt to stick his penis through the hole in the shirt. He was able to do so only with difficulty, as he was forced to bend at the waist at a 45 degree angle. If he stood up straight, "his penis popped back out of the hole." (RT 650-651) This was because the hole, which was midway between his penis and navel, approximately four inches up from his penis and four inches down from his navel, was too high up. In Sanchez' opinion, if appellant's penis had been erect, it would have popped out just as it did when it was flaccid. (RT 651-653)

As to Dorly's stabbing the man with a ballpoint pen, Detective Blizzard testified that she noticed a small, round, abrasion type wound on the back of appellant's left shoulder. Appellant offered no explanation for the mark – he said he did not know how he got it. (RT 313-316) At trial, appellant testified that he believed it was pimple. According to Officer Maldonado, whose medical expertise consisted of his being a former lifeguard and having an emergency medical

23

technician certificate, the abrasion on the back of appellant's left shoulder was a puncture wound, approximately 1/8 of an inch long. Although he observed no blood or ink around the wound, he opined that the indentation of the skin indicated it had been punctured with a pointed sharp object. He believed the difference between a puncture wound and a scratched pimple or other type of wound was that the former would have an indentation whereas a pimple would involve a raised foundation – resembling more a lump than a crater. In contrast, the *medical* doctor who examined appellant's wound, Dr. Posey, opined that the wound had no characteristics of a puncture wound. (See Dr. Posey's report, Defense Exhibit K; RT 938-939.) Furthermore, although Maldonado believed Dorly's demonstration was "consistent with" a wound located on appellant's left upper shoulder, he conceded that Dorly did not really know where she had stuck the man with her pen. (RT 641-645)

That appellant was the only likely suspect was doubtful given the numerous apartments and men in the vicinity. Officer Maldonado conceded that other than contacting one neighbor and appellant's family members, he had not contacted any other residents of the apartment complex, and he never returned on any other days to see who lived in the other apartments. (RT 634) Moreover, the unit in which appellant resided was one within a multiple complex at 18425 Saticoy, consisting of six, three-story buildings – two main buildings facing Saticoy, two

24

main buildings between Lull and Saticoy, and two buildings on the Lull side, with at least six separate gates by which to gain access to the complex.  (RT 616, 638) There were also two other apartment buildings to the east of the six-building complex, an alley between those two buildings for access to parking, and a clinic on the corner of Saticoy and Canby, which is a treatment center for heroin addicts. (RT 612-617)   As to other similar looking men in the building, Anita Orosco Mercado testified that two Mexican men lived in unit number 7, one who had black hair, a mustache, and was about five nine, with some weight on him, not fat but full, in his early 30's.  The other, his brother, was slightly shorter and chubbier, about five six, with dark features and facial hair.  Anita had also seen Hispanic-looking men going in and out of the clinic, which she described as a very busy place.  (RT 682-683) Most significantly, however, was the statement of appellant's neighbor Kim, who lived in unit no. 9, that a week prior to appellant's arrest, she had seen a strange, white, dirty looking male, possibly homeless, loitering in front of the clinic next door, and that, a few days before appellant was arrested, she was contacted by the police asking if she had seen a suspicious male hanging around the area.  (See Handwritten Interview Statement, Defense Exhibit L admitted in evidence; RT 904-905, 938.)

Appellant also provided an alibi – his sister Anita, who was home with him at the time of the alleged incident.  Anita testified that, at approximately

3:00 p.m., she was in the kitchen, where she had begun preparing dinner for her family because she was going to a dinner meeting and she needed about two hours to get ready.   At that time, appellant was lying down in the couch in the living room, which was visible from the upper level kitchen area.   The television was on and she could see that he was asleep.   At the beginning of her preparations, at around 3:05 or 3:10, Anita decided to ask for appellant's help in peeling onions; but when she saw he was asleep, she decided not to wake him up.   Appellant arose from the sofa some time after 4:00.   Anita, who was on her way upstairs, asked him to eat something before the children came downstairs.   Ten minutes later, Anita saw appellant in the kitchen eating.   (RT 657-664, 676)

A crucial factor weighing against appellant's guilt is the medical evaluation of  Dr. Raymond Anderson, a psychologist specialized in the assessment and treatment of sex offender patients.   Specifically, in his summary of findings, Dr. Raymond Anderson, opined:

> "Basically, [appellant] does not seem to be personally disordered in a way or to a degree that would be consistent with either exhibitionist or rape behavior.   Any offense behavior in which he may have engaged would, most probably, be out of character and/or in response to strong situational inducements or pressures."

26

While Dr. Anderson acknowledged that appellant may have sexual abnormalities the diagnostic study failed to detect or that he may have engaged in behavior that was unusual and atypical for him, it was nevertheless his opinion that "the inconsistency between [appellant's] apparent personal and sexual functioning on the one hand and the allegations on the other is so sharp that it is worth considering as part of the total fact finding in this case."    The parties stipulated that Dr. Anderson would have testified in accordance with his report and that said report (Defense Exhibit J) would be admitted in evidence in lieu of his testimony.  (RT 723; Defense Exhibit J.)

Dr. Anderson's opinion was corroborated by character witnesses for the defense. Deputy Sheriff Phil Johnson, who has known appellant since his infancy, opined that he could not see appellant committing these or any violent crimes, because appellant "does not have a violent bone in his body. . . He's a very humble man, a very simple man, and you would have to be crazy to do what he is charged with and he's not crazy." Appellant's brother-in-law, Mark Mercado, agreed, opining that appellant would not commit a kidnapping or a physical assault on a woman or girl with the intent to commit a sex crime.

In summary, the perpetrator had most of his face concealed by a beanie; and neither victim was able to identify appellant at a live line-up of similar looking males with facial hair. There were multiple apartments and a clinic for drug addicts in the vicinity; and a strange man had been seen loitering there a week prior

27

to appellant's arrest. Dorly's sister, Jennifer, initially reported seeing a man exposing himself outside of apartment no. 7, not number 3, where appellant resided, and appellant's sister Anita described two Hispanic men, both having facial hair, about the same height as appellant, who lived in unit no. 9.   Neither the identification of appellant, nor the circumstantial evidence that he was wearing a beanie and/or a tan sweater with a stipe across the middle (clothing which had been described by Dorly first as a shirt then later as a *green* sweater, and which the prosecutor described as having many stripes) or driving a red convertible Jeep, is substantial evidence, i.e., evidence that is credible or of solid value, from which a rational trier of fact could have found, beyond a reasonable doubt, that appellant, as opposed to any one of numerous men in the neighborhood, was the perpetrator of the crimes charged.  When combined with the facts that appellant did not fit a sexual predator profile and the *medical* report showed the mark on appellant's shoulder was not a puncture-type wound, the evidence must be found constitutionally insufficient to sustain appellant's conviction on all counts.

## II.

### THE TRIAL COURT ABUSED ITS DISCRETION
### BY NOT DISMISSING THE STRIKE.

Penal Code section 1385 authorizes the court to dismiss strike allegations in furtherance of justice.  (People v. Superior Court (Romero)) (1996) 13

28

Cal.4th 497.)   A relevant consideration in deciding whether to strike a prior

conviction is the length of sentence the defendant will receive if a "strike" is

dismissed.  (People v. Garcia (1999) 20 Cal.4th 490.)  In fact, a defendant's

sentence "is the overarching consideration because the underlying purpose of striking

prior conviction allegations is the avoidance of unjust sentences."  (Garcia, 20

Cal.4th at p. 500.)   Moreover, a defendant's criminal past, "while relevant, is not

singularly dispositive" to the determination.  (People v. Superior Court (Alvarez)

(1997) 14 Cal.4th 968, 973.)   Prior to sentencing, appellant's counsel moved to

dismiss the strike allegation, arguing that a low term sentence of two years plus the

five year enhancement was commensurate punishment.   Indeed, a 13 year term is

disproportionate to the severity of this offense, which resulting in no harm.

     A defendant is entitled to have the sentencing court give *serious*

consideration to mitigating circumstances, weighing them against the aggravating

circumstances.  (People v. Tatlis, supra, 230 Cal.App.3d at p. 1274 [emphasis

added].)  Factors other than those listed in rules 421 and 423 should be considered

under rule 408(a) (People v. Covino (1980) 100 Cal.App.3d 660, 671-672), which

provides that the sentencing criteria enumerated "do not prohibit the application of

criteria reasonably related to the decision being made."   Rule 428 also permits the

court to consider and apply "any other reasonable circumstances in mitigation that

are present."   Rule 409 provides that relevant criteria enumerated in the rules shall

29

be deemed to have been considered by the sentencing judge "unless the record affirmatively reflects otherwise." Here, the presumption of rule 409 has been rebutted.

The court's failure to consider the harsh punishment already mandated by the five-year mandatory enhancement (Pen. Code, § 667, subd. (a)(1)), the fact that the strike (a failed attempt through a handwritten note to obtain money from a bank) was unsophisticated and nonviolent, that appellant pled nolo contendere and received 3 years probation (with 270 days in county jail) for that offense, and the additional mitigating circumstances that he had successfully completed his probation, plus that fact that no actual sexual offense was committed and the lack of any injury to the victim, demonstrates the court's failure to exercise its discretion to consider mitigating factors not specifically enumerated. The only aggravating factor enumerated by the court was its observation that this was a "sad" and seemingly terrifying incident for the victim. However, as defense counsel argued, the fear engendered is subsumed in the sexual assault offense (Pen. Code, § 220) itself.

In People v. Bishop (1997) 56 Cal.App.4th 1245, the defendant, was convicted of petty theft with a prior. He had suffered 11 prior convictions, eight for which he had served person terms and three within the meaning of the three strikes law. He had never successfully completed parole and his present offense was committed within three days of his discharge from prison. Although the prosecutor

30

insisted that Bishop was the type of offender the electorate had in mind when

enacting Three Strikes, the trial court dismissed two of Bishop's strikes in

furtherance of justice, finding that a 12 year sentence was a significant enough

period of time to "stop the revolving door" on Bishop.   In holding this was not an

abuse of discretion, the court of appeal compared Bishop's misdeeds with those of

the "far too many violent recidivists in this state," and determined Bishop was not

the "worst" they had seen. (Id., at p. 1251)  The court further opined:  "The length

of sentence to be imposed also presents an open-ended inquiry because, when

considered in conjunction with the defendant's age [50], it presents the trial court

with an opportunity to evaluate factors such as how long the state maintains an

interest in keeping the defendant as a public charge and after what period of

incarceration he is no longer likely to offend again." (Id., at pp. 1250-1251.)

　　　　Like Mr. Bishop, appellant is not undeserving of leniency.  His current

offense, while serious, did not result in any actual physical harm.  Unlike Mr.

Bishop, appellant has suffered only *one* prior felony, a robbery.  That felony, while

serious in the abstract, was in actuality a nonviolent, misguided, and utterly

unsophisticated attempt to obtain money from a bank through the use of a threatening

note.[4]   (CT 146-156)   At 33 years old, his being kept a public charge for 13 years

---

[4] At the preliminary hearing in that case, the bank teller testified that appellant, after
having waited in line, handed her an envelope at the window, which said: "Hi, I have a gun.  I
want $5,000 now.  Don't attempt to call the police or sound the alarm or someone will get

is not in furtherance of justice.   Conceding that there is the aggravating

circumstance of his prior conviction resulting in his "habitual criminal" status, a

reasonable judge could find that the five-year enhancement (pursuant only to section

667, subd. (a)(1) plus a low or middle term for the current offense itself  is

commensurate punishment.  Insisting upon a 13-year term, when 7 or 9 years would

adequately punish the current offense as well as appellant's recidivism, does not

import the exercise of "discriminating judgment within the bounds of reason."  (See

In re  Cortez (1991) 6 Cal.3d 78, 85-86.)   The trial court should be ordered, on

remand, to dismiss the strike and impose a less punitive sentence.


### III.

### THE 13-YEAR SENTENCE FOR THIS NONVIOLENT
### OFFENSE CONSTITUTES CRUEL AND UNUSUAL PUNISHMENT.


Appellant's punishment is  grossly disproportionate to this inchoate

assault.  The Eighth Amendment of the United States Constitution provides:

Excessive bail shall not be required, nor excessive fines imposed, nor cruel and

unusual punishments inflicted."   Article I, section 17 of the California

---

hurt."  Appellant told the teller to put what money she had in the envelope.  When she put
$4,950 from her drawers into the envelope, appellant turned around and walked out the door.
The teller pushed the silent alarm and appellant was arrested.  The entire incident, including
appellant's arrest, lasted ten minutes.  Appellant had displayed no weapons and none were
recovered from him. (CT 146-157)

Constitutional also provides, in relevant part:  "Cruel or unusual punishment may

not be inflicted. . . ."    Analysis of whether a sentence imposes cruel or unusual

punishment begins with the recognition that "in our tripartite system of government

it is the function of the legislative branch to define crimes and prescribe

punishments, and that such questions are in the first instance for the judgment of the

Legislature alone."  (In re Lynch (1972) 8 Cal.3d 410, 414.)    Nevertheless, the

Legislature's authority is circumscribed by the constitutional prohibition against

cruel or unusual punishment, and it is the "imperative task of the judicial branch, as

coequal guardian of the Constitution, to condemn any violation of that prohibition."

(Ibid.)    A punishment may violate the constitution "not only if it is inflicted by a

cruel or unusual method, but also if it is grossly disproportionate to the offense for

which it is imposed."  (People v. Dillon (1983) 34 Cal.3d 441, 478.)

      The United States and California Supreme Courts have set forth three

criteria for determining whether a punishment is disproportionate:    The court must

(1) examine "the nature of the offense and/or the offender, with particular regard to

the degree of danger both present to society," (2) determine whether the defendant

has been treated in the same manner as, or more severely than, criminals who have

committed more serious crimes;  and (3) compare the challenged penalty with

punishments prescribed for the same offense in other jurisdictions.  (Solem v. Helm

(1983) 463 U.S. 277, 290-300;  In re Lynch, supra, 8 Cal.3d at pp. 425-427.)    The

court need not find the punishment disproportionate in all three respects; rather, a finding of disproportionality based on *any* of these criteria will suffice. (People v. Dillon, supra, 34 Cal.3d 441, 487, fn. 38; In re Rodriguez (1975) 14 Cal.3d 639, 656.)   Applying the first criterion to the instant case, a second strike sentence for these offenses is so disproportionate to the severity of appellant's crime as to constitute cruel and unusual punishment.

Here, the penalty imposed is disproportionate as applied to this offense and offender.   In examining the nature of a defendant's offense, courts consider "not only the offense in the abstract, but also the facts of the crime in question, including such factors as its motive, the way it was committed, the extent of the defendant's involvement, and the consequences of his acts. (People v. Dillon, supra, 34 Cal.3d at p. 49.) In examining the nature of the offender, courts determine "whether the punishment is grossly disproportionate to the defendant's individual culpability as shown by such factors as his age, prior criminality, personal characteristics, and state of mind." (Id., at p. 479.)  Appellant's prior and current offenses do not warrant 13 years' punishment.   That the People realize this is evident by their pre-trial offer of four years.  As explained in section II, appellant's prior unarmed "robbing" of a bank teller through a note, while perhaps unwise, was not violent or dangerous; and his current offense resulted in no actual sex crime or other physical harm.   Also, appellant satisfactorily completed his probation for that

34

robbery; and he is also receiving five additional years because of it.    (Pen. Code, § 667, subd. (a)(1).)    Concededly, a defendant's past offenses are a relevant consideration.    They do not, however, "result in a *pro tanto* repeal of the cruel or unusual punishment clause."    (In re Lynch, supra, 8 Cal.3d at p. 431.)    Appellant is not so dangerous to society to justify his being incarcerated for 13 years, especially when the evidence against him is so weak; he does not fit the profile of a sexual predator and the crime has been found to be "out of character" for him, by a psychiatric expert;    no harm resulted in either his prior or the current offense; and the People initially believed four years would have been sufficient and commensurate punishment.

This Court must not uphold legislation which, as applied here, does not meet the constitutional standards of individual accountability and proportionate punishment.    (See People v. Dillon, supra, 34 Cal.3d at pp. 488-489.)    The second strike term, in addition to the five years for his one prior and this current offense, both serious in the abstract but in actuality, as neither resulted in any harm, is grossly disproportionate to his culpability.    Such a sentence is unconscionable and violates the United States and the California Constitutions' prohibition against cruel or unusual punishment.

# CONCLUSION

Because the evidence is insufficient to sustain appellant's convictions, they violate the due process clauses of the California and United States Constitutions and must be reversed.   If not reversed, the matter must be remanded so that appellant's sentence can be reduced to be more commensurate with his crimes.


DATED:    March 1, 2004            Respectfully submitted,


                                    Maxine Weksler
                                    Attorney for Appellant,
                                    Ivan Toland

36

## DECLARATION OF SERVICE BY MAIL

STATE OF CALIFORNIA     )
                                 ) ss.

COUNTY OF LOS ANGELES   )

      I, Maxine Weksler, hereby declare:

      I am a citizen of the United States, over the age of 18 years, and not a party to the instant proceeding.  I am a resident of the County of Los Angeles, State of California, and my business address is Post Office Box 157, Agoura Hills, CA 91376.

      On March 2, 2004 I served the document described as

      APPELLANT'S OPENING BRIEF

upon the following:

Mr. Ivan Toland, #V-04292
Ironwood State Prison
P.O. Box 2229
Ironwood, CA 92226

California Appellate Project
520 S. Grand Ave., 4th Floor
Los Angeles, CA 90071

Office of Attorney General
300 S. Spring Street
Los Angeles, CA 90013-1233

County Clerk
210 W. Temple Street, Rm. M-6
Los Angeles, CA 90012
For delivery to: Hon. Michael Hoff

Office of District Attorney
210 W. Temple Street
Los Angeles, CA 90012

by placing a true copy of said document enclosed in a sealed envelope with postage fully prepaid in the United States mail.

      Executed on March 2, 2004 at Agoura Hills, California.

      I declare under penalty of perjury that the foregoing is true and correct.

_Maxine Weksler_
Maxine Weksler

# PROOF OF SERVICE BY MAIL

[CCP sec.1013A & 2015.5; 28 U. S. C. sec. 1746]

I, _IVAN TOLAND_ AM A RESIDENT OF THE COUNTY OF _L.A. COUNTY_, STATE OF CALIFORNIA; I AM OVER THE AGE OF EIGHTEEN (18) YEARS AND (NOT) (A) PARTY TO THE FOREGOING ATTACHED CAUSE OF ACTION. MY CURRENT ADDRESS IS:

(NAME)(CDC#) _IVAN TOLAND_
(BLDG. & CELL #) ~~A4~~ A1-119 up
PO Box # _5242_
CSATF/SP
CORCORAN, CALIFORNIA 93212-5242

ON THE _10 11_ DAY OF _10_, 2007, I SERVED OR CAUSED TO BE SERVED THE FOLLOWING DOCUMENTS:
1. _28 U.S.C. 2254_
2. _SoCAl District_
3. _____
4. _____
5. _____

ON THE FOLLOWING NAMED PARTY(S), AND ADDRESSED AS FOLLOWS:
1. _Clerk of U.S. District_     2. _____
_Court Room 4290_               _____
_800 Front Street_              _____
_San Diego, CA. 92101_          _____

3. _____              4. _____
_____                 _____
_____                 _____
_____                 _____

THERE IS REGULAR DELIVERY BY UNITED STATES MAIL AT THE PLACE ADDRESSED, AND/OR THERE IS REGULAR COMMUNICATION BETWEEN THE PLACE OF MAILING AND THE PLACE SO ADDRESSED. I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

DATED: _11-10-_ 2007

DECLARANT / PETITIONER / PLAINTIFF IN PRO PER

JS44
(Rev. 07/89)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE SECOND PAGE OF THIS FORM.)

**I (a) PLAINTIFFS**

Ivan Toland

2254    1983

DEFENDANTS

FILING FEE PAID

Yes___    No √

The People

NOV 1 9 2007

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

IFP MOTION FILED

Yes___    No___

**(b) COUNTY OF RESIDENCE OF FIRST LISTED**   Kings
**PLAINTIFF**
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT_____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND

COPIES SENT TO
Court    ProSe

**(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)**

The People
PO Box 5242
Corcoran, CA 93212
V-04292

**ATTORNEYS (IF KNOWN)**

'07 CV 2210    JAH POR

**II. BASIS OF JURISDICTION (PLACE AN x IN ONE BOX ONLY)**

☐ 1 U.S. Government Plaintiff

☒ 3 Federal Question
(U.S. Government Not a Party)

☐ 2 U.S. Government Defendant

☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN X IN ONE BOX**
**(For Diversity Cases Only)    FOR PLAINTIFF AND ONE BOX FOR DEFENDANT**

|  | PT | DEF |  | PT | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. CAUSE OF ACTION (CITE THE US CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE. DO NOT CITE**
**JURISDICTIONAL STATUTES UNLESS DIVERSITY).**

## 28 U.S.C. 2254

**V. NATURE OF SUIT (PLACE AN X IN ONE BOX ONLY)**

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reappointment |
| ☐ Marine | ☐ 310 Airplane | ☐ 362 Personal Injury-Medical Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ Miller Act | ☐ 315 Airplane Product Liability | | ☐ 625 Drug Related Seizure | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 365 Personal Injury - Product Liability | of Property 21 USC881 | ☐ 820 Copyrights | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | | ☐ 640 RR & Truck | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | ☐ 650 Airline Regs | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| | | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 861 HIA (13958) | ☐ 850 Securities/Commodities Exchange |
| ☐ 153 Recovery of Overpayment of Veterans Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | ☐ 862 Black Lung (923) | |
| | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | ☐ 863 DIWC/DIWW (405(g)) | ☐ 875 Customer Challenge 12 USC |
| ☐ 160 Stockholders Suits | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ Other Contract | | | ☐ 720 Labor/Mgmt. Relations | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 195 Contract Product Liability | | | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 790 Other Labor Litigation | ☐ 871 IRS - Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | | ☐ 791 Empl. Ret. Inc. | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/Accommodations | ☒ 530 General | ☐ Security Act | | ☐ 950 Constitutionality of State |
| ☐ 240 Tort to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 890 Other Statutory Actions |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | | | |
| ☐ 290 All Other Real Property | | ☐ 550 Civil Rights | | | |

**VI. ORIGIN (PLACE AN X IN ONE BOX ONLY)**

☒ 1 Original Proceeding   ☐ 2 Removal from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify)   ☐ 6 Multidistrict Litigation   ☐ 7 Appeal to District Judge from Magistrate Judgment

**VII. REQUESTED IN**
**COMPLAINT:**

☐ CHECK IF THIS IS A CLASS ACTION UNDER f.r.c.p. 23

DEMAND $_____

Check YES only if demanded in complaint:
JURY DEMAND: ☐ YES ☐ NO

**VIII. RELATED CASE(S) IF ANY (See Instructions):**    JUDGE _____    Docket Number _____

DATE    11/19/2007

SIGNATURE OF ATTORNEY OF RECORD

*R. Miller*